# TRI-STATE TRANSIT CO. OF LOUISIANA, INC., v. DUFFEY.—173 S. W. (2d) 706.*

Western Section.   November 15, 1940.

Petition for Certiorari denied by Supreme Court, March 1, 1941.

*This opinion should have appeared in Volume 26 but was inadvertently omitted.

Winchester & Bearman and Frank H. Gailor, all of Memphis, for plaintiff in error.

Wils Davis, Hugh Stanton, and W. F. Denman, all of Memphis, for defendant in error.

ANDERSON, J. This was an action instituted by W. G. Duffey, Administrator of the estate of Dr. E. E. Shell, deceased, against the Tri-State Transit Company of Louisiana, Inc., to recover damages for the alleged wrongful death of the plaintiff's intestate which resulted

from injuries sustained when he was struck by a large passenger bus operated by a servant of the defendant. There was a verdict for the plaintiff in the sum of $7,500. Upon consideration of a motion for a new trial the Judge suggested a remittitur of $1,500, and this suggestion having been accepted, a judgment was entered for the balance. The defendant appealed in error.

The accident occurred about 6 o'clock P. M. on November 18, 1938, while the plaintiff's intestate was crossing from the south side to the north side of Madison Avenue at a street intersection in the City of Memphis. The defendant's bus was proceeding west on the north side of Madison.

The plaintiff plead and proved the provisions of a city ordinance fixing the maximum speed limit for the operation of motor vehicles on the streets at 25 miles per hour and also providing that "drivers of vehicles shall exercise all possible care not to interfere with or injure pedestrians lawfully in the use of streets, crossings and cross-walks." He also relied on subsection (c) of Code section 2687, which, with certain exceptions, not here material, omitted, is as follows: "The driver of any vehicle upon a road, street, or highway within a business or residence shall yield the right of way to a pedestrian crossing such road, street or highway within any clearly marked cross-walk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block . . . ."

The chief contention is that the trial judge should have sustained the defendant's motion for a directed verdict, and this is based primarily upon the asserted proposition that the undisputed evidence showed that the deceased was guilty of proximate contributory negligence.

■ Under settled principles this question must be disposed of upon a consideration of the evidence tending to support the verdict without reference to that opposed thereto. Having regard to this rule, we find that there was material evidence tending to show these facts. Madison Avenue is 54 feet in width from curb to curb and runs east and west, carrying a double line of street car tracks in the center. It is intersected by Pauline Street, in which there is an offset of about 100 feet. The latter street, north of Madison, is known as north Pauline and south of Madison as south Pauline. Due to the offset the west line of north Pauline at the point where it intersects Madison is 98 feet east of the east line of south Pauline projected across Madison. The plaintiff's intestate was a physician about 67 years of age, engaged in the general practice of medicine in Prescott, Arkansas. He had come to Memphis with his step-son, W. P. Dedwoody, and the latter's wife and their little child, for the purpose of having the child treated at Campbell's Clinic, which was situated on Madison Avenue about two blocks west of Pauline. They had procured living quarters located on the north side of Madison Avenue about opposite the point where south Pauline enters that thoroughfare. Just prior to the accident, plaintiff's intestate, his step-son, the latter's wife and their child had patronized a cafe located on the south side of Madison, east of south Pauline. Upon leaving the cafe, intending to go to their living quarters, they proceeded west on the south side of Madison to the southeast corner of that avenue and south Pauline, left the curb at that point and started across Madison Avenue traveling in the regular pedestrian crossing included in the prolongation of the east boundary line of south Pauline.

At or about that time the defendant's passenger bus, in which were riding a number of football players of Mississippi State University, who were en route from their school to Memphis to play a football game, was traveling west on the north side of Madison Avenue. Mr. Dedwoody, who had the child in his arms, and his wife stopped near the north rail of the north street car track to let the bus pass. The plaintiff's intestate did not stop but continued in an attempt to cross the street. He was struck by the right side of the front of the bus and knocked some 20 to 25 feet west, sustaining injuries from which he died.

Dedwoody testified that as he stopped near the north rail of the street car track his wife and plaintiff's intestate, Dr. Shell, "were a little behind me; just a little bit to my left; . . . so I turned around and looked at them, then I turned back and waited for the by-passing bus to pass, and when I saw Dr. Shell, he was a little to my left, just behind me; and that is the last I saw either one of them until after the accident." Another witness by name of Gore, who saw the accident, was walking east on the north side of Madison. He testified that he saw the party of three leave the southeast corner of Madison and south Pauline and start across the street "going a little slow"; that "as they approached the middle they slowed up a little bit and the woman and one man stopped in the middle of the street and the other man instead of stopping attempted to run across the street;" that "he was going faster than a real fast walk" and "made about two jumps covering about six or eight feet from the center of the street before the bus hit him."

A number of witnesses testified that at the time of the accident the bus was traveling at a rate of speed of

from 25 to 30 miles an hour. It was equipped with air brakes that were in good condition and after the deceased was struck the vehicle was brought to a stop within a distance equal to its own length.

The driver of the bus, testifying for the defendant, stated that he did not see the deceased until "he was directly in front of my bus", but that "just before I got to the intersection of Pauline and Madison I noticed a man and lady coming from the south side of Madison Avenue toward the north curb, and the man was carrying a little child".; that "I had slowed up the bus at the intersection, and there was not anything coming out of that intersection"; that the man and the woman crossing the street "were looking towards my bus" and "they stopped right at the edge of the street car track"; "I took my foot off of the brake pedal and put it back on the accelerator . . . just ready when necessary to put gas to it"; that he was traveling "between 20 and 25 miles an hour"; that when the couple crossing the street stopped "I turned my eyes ahead, but I still had them in mind. I never had them out of my mind, and they were the only two people I had seen at all, and I just went on in my bus and passed them, and I saw a man right in front of me, right square in front of me, and he was running, and he made one step, and the right front side of my bus hit him and knocked him off to the right, and he ran ahead, approximately 10 to 12 feet ahead of the bus, and to the right"; and that "as soon as I saw him I took my foot off of the accelerator and I jammed on the brake", and the bus came to a stop in about 30 feet, "right up next to the car track".

On cross-examination the driver testified that the man and woman had stopped "before I reached north Paul-

ine"; that at that time he was "approximately 130 or 135 feet to the east." Another employee of the defendant who had been alternating in driving the vehicle, testified that the bus was from 50 to 100 feet east of the intersection of Madison with north Pauline "when I saw two people coming out in the street, just leaving the curb"; that "they came out from the curb to the center of the street and stopped on the outside car track"; that he first saw the deceased when he was about 8 feet distant "directly in front of the driver's seat"; that he was then running.

On cross-examination he testified that he watched a man and woman as they traveled all the way across Madison Avenue until they stopped and that he never did see the third person, who turned out to be the deceased, until he was immediately in front of the bus, running slightly at an angle to the northwest.

A second bus, owned and operated by the defendant, was following immediately behind that which struck the deceased. It was also conveying football players to Memphis. The driver of that truck also testified that he saw Dedwoody and wife as they crossed the street "but I never did see Dr. Shell until he ran out from behind these people. He just darted out across the street from the other side, this side up here, and kind of came angling across the street with a slight angle to it, the way he came." He also testified that the front of the other bus "was almost even with these people when I saw the man run out".

Incidentally, the defendant's drivers all testified in effect that the point at which the party was crossing Madison Avenue was west of a prolongation of the west side of south Pauline Street but not in that portion of

the street where pedestrians were supposed to cross. This testimony simply made a conflict in the evidence which was settled by the jury in the plaintiff's favor.

As clearly appears from what has been said, there was material evidence to support the view that in the operation of the bus the defendant's servant was guilty of negligence, in that the bus was being operated in violation of the speed limit fixed by the city ordinance, and in other respects not necessary to mention, and that such negligence was a proximate cause of the injuries that resulted in the death of the plaintiff's intestate. In fact, we do not understand the contrary to be seriously contended. But, as already stated, the chief contention, ably pressed, is that the deceased was guilty of proximate contributory negligence in that he left a place of safety and darted directly in front of the defendant's bus; that this appears from the evidence regarded in the light most favorable to the plaintiff, and, hence, a verdict should have been directed on that ground.

This contention requires a determination of the relative rights and duties at street intersections of pedestrians and the operators of motor vehicles. In the case of Pryor's Adm'r v. Otter, 268 Ky. 602, 105 S. W. (2d) 564, 567, there was under consideration a city ordinance which, among other things, provided that under the conditions specified pedestrians should have the right of way at street intersections over such vehicles. In construing that ordinance, the court said:

"The definition of 'right-of-way' given in the ordinance—'immediate and preferential'—coupled with our own pronouncements in analogous cases (involving only vehicles, under section 2739g-37, Statutes) requires it to be said that this right of precedence given the pedestrian

is relative and not absolute or inflexible. It only has the effect of turning the scales where the rights of the parties are balanced. It has no special application except where the parties approach the 'path of the vehicle' so nearly at the same time and at such rates of speed, respectively, that if both proceed each without regard to the other collision or interference between them is reasonably to be apprehended. In such condition, the pedestrian has the first use of the crossing, and it is made the duty of the motorist to yield the right of way to the pedestrian by diverting his course, slowing down or stopping in order to give a reasonable opportunity to pass in safety. 2 Blashfield's Cyc. of Automobile Law [and Practice], Perm. Ed., sec. 1272; Berry, secs. 3.13, 3.191; annotation, 21 A. L. R. 974; 5 Am. Jur. 664; Bradley v. Schmidt, 223 Ky. 784, 4 S. W. (2d) 703, 57 A. L. R. 1100; Bora v. Yellow Cab Company, 103 N. J. L. 377, 135 A. 889; Olsen v. Peerless Laundry, 111 Wash. 660, 191 P. 756; Lucas v. Craft, 161 Va. 228, 170 S. E. 836; Heikkinen v. Cashen, 183 Minn. 146, 235 N. W. 879; Horwitz v. Eurove, 129 Ohio St. 8, 193 N. E. 644, 96 A. L. R. 782.

"Under such circumstances, the pedestrian is not obliged to stop or slacken his pace. But because he has the right of way he may not proceed serenely oblivious of surrounding circumstances. He is of course bound to exercise ordinary care for his own safety. Weidner v. Otto, supra [171 Ky. 167, 188 S. W. 355]; Wilder v. Cadle, 227 Ky. 486, 13 S. W. (2d) 497; Melville v. Rollwage, supra [171 Ky. 607, 188 S. W. 638, L. R. A. 1917B, 133]; Bruce's Adm'x v. Callahan, supra [185 Ky. 1, 213 S. W.; 557; Peak v. Arnett, 233 Ky. 756, 26 S. W. (2d) 1035; Lieberman v. McLaughlin, 233 Ky. 763, 26 S. W. (2d) 753; Barrett v. Alamito Dairy Company, 105 Neb.

658, 181 N. W. 550, 21 A. L. R. 966; Sawyer v. Blankenship, 160 Va. 651, 169 S. E. 551. If the machine is so near him that a collision would naturally be expected to follow, continuing on his way across could hardly be regarded as reasonable or prudent. Rupp v. Keebler, 175 Ill. App. 619; Minnis v. Lemp Brewing Company (Mo. App.), 226 S. W. 999; Brown v. Chambers, 65 Pa. Super. 373; Thrapp v. Meyers, 114 Neb. 689, 209 N. W. 238, 47 A. L. R. 585.''

Cases to the same general effect are collected in a note in 96 A. L. R. 786.

We think the foregoing statement of the Kentucky court is sound and applicable to that provision of Code section 2687, subsection (c) invoked by the plaintiff. We adopt it as a proper construction of the rights and duties of the parties under that statutory provision. See, also, Hunter v. Stacey, 24 Tenn. App. 158, 141 S. W. (2d) 921; and Waller v. Morgan, 23 Tenn. App. 355, 133 S. W. (2d) 614.

The gist of the defendant's argument is to be found in the following from its brief: ''If the plaintiff's intestate had looked he would have seen, and certainly with knowledge that the bus was coming west on Madison Avenue, and certainly with the knowledge that Madison Avenue is a popular thoroughfare with motor vehicles constantly approaching from the east, he was charged with the duty of looking, and, if he failed to do so, he was negligent and cannot recover.''

To sustain this contention we would have to hold that it was the absolute duty of a pedestrian in crossing a city street at an intersection to look for approaching automobiles and that as a matter of law a failure to do so is a bar to a recovery for any injuries sustained by the pedestrian when struck by such a vehicle. This is

the rule applicable at railroad crossings but the courts of this State have refused to adopt it as being applicable to the situation stated. Hunter v. Stacey, supra, and cases cited; see also cases collected in the note in 79 A. L. R. 1073. The obligation of a pedestrian at a street intersection is to exercise ordinary care which may, or may not, according to the circumstances, require that he look before proceeding or while in the course of crossing. 25 Am. Jur. 523, sec. 228.

We are unwilling to rule, as we would have to do if we directed a verdict and dismissed the suit, as the defendant contends we should do, that, under the circumstances stated, ordinary care imperatively demanded of plaintiff's intestate, who was lawfully in the middle of the street, that, after having reached that point, he look to the east before proceeding. To say the very least of it, that was a question about which we think reasonable minds might differ, especially when it is considered that by positive statutory enactment the plaintiff's intestate had the right of way. True, he could not on this account proceed with impunity, but it was a factor to be considered in determining what ordinary prudence required because, having the right of way, he was entitled to assume that any vehicle that might be approaching, would do what the statute requires, namely, yield the right of way. In short, in a given case the ordinarily prudent person, in the exercise of ordinary care, not having the right of way might look for approaching vehicles while crossing the street, whereas, the contrary might be true if he had the right of way. To say the least of it, under the facts of this case, that was a question for the jury. Numerous cases so holding on more or less similar facts are collected in the note appearing in 96 A. L. R. 786.

Our own cases are fully in accord with this view. Studer v. Plumlee, 130 Tenn. 517, 172 S. W. 305, is almost squarely in point upon the determinative facts. In that case, Plumlee was struck and injured by an automobile as he entered a street intersection in Chattanooga on horseback. There was a judgment for the plaintiff, and the defendant contended that a verdict should have been directed because of the proximate contributory negligence of the plaintiff as a matter of law ''in failing to look up and down Market street, a much traveled thoroughfare, before attempting to ride his horse across.'' This contention was overruled, the court holding that the question was properly submitted to the jury. So far as appears this conclusion was reached without regard to who had the right of way and altogether independently of that factor. Hence, upon its facts the present case furnishes a situation more favorable to the plaintiff than did that one.

This court made similar rulings upon analogous facts in the cases of Taylor v. Arnold, 2 Tenn. App. 246, and Elmore v. Thompson, infra; and, although the rights of pedestrians were not involved, the controlling principle was again applied in Hunter v. Stacey and Waller v. Morgan, supra; see, also, Hodge v. Hamilton, 155 Tenn. 403, 406, 293 S. W. 752; National Cash R. Co. v. Leach, 3 Tenn. App. 411.

The defendant, in an able and exhaustive brief, has cited numerous cases from other jurisdictions which it claims supports its contention, but it would serve no useful purpose to discuss these. Our own cases control a disposition of the question.

■ It seems to be contended that because Dedwoody and wife stopped in the middle of the street to let the bus

pass, plaintiff's intestate should have done likewise, and further, that because he observed the other two stop, the defendant's driver, although he claims not to have seen the deceased, had a right to assume that any other pedestrians at or about that point would also stop. Assuming without deciding that, being in without objection, this circumstance the jury might consider in determining what an ordinarily prudent person would have done, it was not the standard by which the rights and duties of the parties are to be measured as a matter of law. It is a well-known fact that in a group of people crossing a street there may be some who are disposed to take greater chances than an ordinarily prudent person would take, and vice versa. In every such case, the question is whether the conduct of the party in question conformed, not to that of his companions, but to that of the hypothetical individual whom the law knows as an "ordinarily prudent person."

But if it be assumed that deceased was negligent in the respect mentioned, to avail defendant anything in this court we would have to hold that, as a matter of law, his negligence not only contributed to the fatal injury but did so as a proximate and not a remote cause or a mere condition. Black v. Moree, 135 Tenn. 73, 84, 185 S. W. 682, L. R. A. 1916E, 1216; Nashville, C. & St. L. R. Co. v. White, 158 Tenn. 407, 15 S. W. (2d) 1; Elmore v. Thompson, 14 Tenn. App, 78.

"The proximate cause of" an injury", said the Court in Deming et al. v. Merchants' Cotton-Press & Storage Co., 90 Tenn. 306, 353, 17 S. W. 89, 99, 13 L. R. A. 518, "may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another,

which, had it not happened, the injury would not have been inflicted.''

However, the '' 'proximate cause' is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning.'' Grigsby & Co. v. Bratton, 128 Tenn. 597, 603, 163 S. W. 804, 806.

The ''remote cause'' of an injury is defined to be ''that which may have happened and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened.'' Anderson v. Baltimore & O. R. Co., 74 W. Va. 17, 81 S. E. 579, 581, 51 L. R. A. (N. S.), 888, 892; note 36 Am. St. Rep. 807.

This definition of the remote cause of an injury was approved by this court in Elmore v. Thompson, 14 Tenn. App. 78, 100, and also in Phillips-Buttorff Mfg. Co. v. McAlexander, 15 Tenn. App. 618. In those cases the court also took occasion to reiterate that ''the inquiry as to what is the proximate cause of an injury, like that of negligence, is always for the jury, unless the determinative facts are undisputed and are reasonably susceptible of but one inference.''

In this case, before the bus reached the intersection of north Pauline, the driver saw or should have seen the group, including the deceased, as they left the curb and started across the street. True, all of the defendant's servants testified that while they saw the others, they did not see the deceased. But the jury were fully warranted in concluding that they either saw or should have seen him, as well as the others. As a matter of fact, one of the witnesses introduced by the defendant, who was a passenger on the rear bus, testified that he saw all three of the adults in the middle of the street, and, as we say,

the jury were warranted in concluding that the driver of the bus saw or should have seen the deceased, as well as the other two, and the question must be disposed of upon that assumption, that is, that he did in fact see what he should have seen. So, he must be held to have been fully aware that pedestrians, having the right-of-way over the bus, were crossing the street in the exercise of that right. According to his own testimony the pedestrians had passed the middle of the street and reached the north street car rail when the bus was 130 to 135 feet distant. Instead of reducing his speed and bringing the bus under control so as to be in a position to do what the statute required, namely, yield the right of way, if that became necessary, he continued at a rate of speed which prevented him from stopping his bus, or otherwise avoiding the injury, when it was obvious that the deceased was not looking in the direction of the bus and did not intend to yield his preferential right by stopping to let it pass.

In short, in approaching the intersection, being chargeable with knowledge of the fact that a pedestrian having the right of way was crossing the street, the driver had no right under the facts of this case to assume that the former would yield that preference to him, but just the contrary, and should have governed the operation of the bus accordingly. The jury doubtless found, as they were warranted in doing, that if the driver of the bus had performed his duty in the respect mentioned, the fatal injury would not have been sustained, even though the deceased continued on his way across the street and, hence, that the failure of the driver to perform that duty was the sole proximate cause of the injury and the conduct of the deceased in the respect mentioned was a remote cause or a mere condition or occasion furnishing oppor-

tunity for the negligent operation of the bus to produce the damage. Compare Elmore v. Thompson, 14 Tenn. App. 78.

Upon the whole we conclude that three questions were properly submitted to the jury, namely, whether the defendant's servant was guilty of negligence that was a proximate cause of the fatal injury, whether the deceased was guilty of negligence, and, if so, whether it was remote negligence or contributed as a proximate cause to the fatal injury.

We may say that we have been impressed with the idea that the defendant's contention seems to have overlooked the fact that the right of way given to deceased was over the entire width of the street and not just a portion of it; that is to say, that under the particular circumstances the deceased's preferential right extended as well to the north side of Madison as it did to that portion of the street he had already crossed before the bus struck him.

The next contention is that the court erred in failing to sustain a motion for a mistrial made during the progress of the trial and based upon the alleged conduct of one of counsel for the plaintiff, who, it was asserted, stated in the presence of several members of the jury that the defendant was not only paying the expenses of the "football boys" who came to Memphis in its behalf but that it was "wining and dining them and giving them anything they want to eat and buying whiskey for them."

During the progress of the trial and in the absence of the jury the defendant had sworn and placed on the stand the court reporter who was reporting the case. He testified that during the noon adjournment there was a large gathering of people at the southwest entrance of

the court house waiting for a heavy rain then in progress to stop or lessen; that he and Mr. Denman, one of counsel for the plaintiff, and several members of the jury, were in the crowd; that he heard Mr. Denman, in response to a question asked as to who was paying the expenses of the "football boys in coming to Memphis and testifying", say, "that the Bus Company was not only paying their expenses but that it was wining and dining them, was giving them anything they want to eat and was buying whiskey for them."

The court reporter could not identify any particular juror who heard the remark, but he asserted that because he himself had heard it that "they are bound to have done so". Incidentally, he did not testify that any member of the jury was in hearing distance at the time the remark was made and there is nothing whatever in his testimony or any other testimony that was offered on the subject to indicate that Mr. Denman was aware that any jurors were nearby. Upon the other hand, Mr. Denman took the stand and testified that while "we were waiting for the rain to subside I don't remember just what was said but I made the statement, in answer to some question, I did say that the boys were having plenty to eat there in the hotel. I did not know that any of the jurors were present". He testified also that he might have said that the witnesses had ordered whiskey sent to their rooms but that he absolutely did not say that the defendant "was sending whiskey up to their room"; that these remarks were made to Dr. Duke, a son-in-law of the plaintiff's intestate, while they were standing in the entrance of the court house waiting for a taxicab. Messrs. Davis and Stanton, the other counsel for the plaintiff, testified in substance that they left the court

room shortly after Mr. Denman left, but reached the crowd at the southwest corner of the court house while he was still there. They both said they recognized only one member of the jury in the crowd, whose name was Goad; that neither of them heard Denman make any remarks one way or the other about the case. A Mrs. Stowers testified that she was in the crowd and she heard no remarks by Denman. On motion for a new trial the juror Goad was introduced and testified that he remembered being in the crowd upon the occasion mentioned but that he did not hear Hr. Denman make any statement of any kind or character about the witnesses; that after the case was decided and the verdict had been returned, Mr. Stanton inquired of the members of the jury if any of them had heard any such statement by Mr. Denman as that in question, and that they all said they had not.

The trial judge ruled on the matter twice, once in overruling the motion for a mistrial and again on consideration of the motion for a new trial. He manifestly came to the conclusion that the evidence adduced did not warrant the view that the rights of the defendant had been prejudiced by the incident referred to. We concur. We do not think that the rulings made in the two cases of Mynatt & Howell v. Hubbs, 6 Heisk. 320, and Davidson v. Manlove, 2 Cold, 346, cited by the defendant in this connection, contemplate a factual situation such as that which the trial judge necessarily found to exist in the present case.

It is also contended by an appropriate assignment of error that the verdict as reduced by the trial judge is excessive, and so much so as to evidence passion, prejudice and caprice on the part of the jury. There was evidence to show that the deceased was a highly respected

citizen of his community, 67 years of age, in good health, actively engaged in the general practice of medicine from which source he was earning at the time of his death $500.00 or $600.00 a month and in addition he owned and operated 600 or 700 acres of farm land.

In view of these facts we are unable to say that the verdict as reduced is excessive. In fact we think it is a reasonable assumption that the remittitur was suggested because the trial judge concluded that the deceased was guilty of remote negligence, a question that we do not have to pass on.

There are a number of assignments of error based on the refusal of the trial judge to give in his charge certain special requests tendered by the defendant. These are supported neither by brief nor argument. We are therefore at liberty to treat the questions thus raised as having been abandoned. Ward v. Gulf, M. & N. R. Co., 23 Tenn. App. 533, 530, 134 S. W. (2d) 917; McDonnell v. Amo, 162 Tenn. 36, 34 S. W. (2d) 212; State ex rel. v. Credit Men's Ass'n, 163 Tenn. 450, 470, 43 S. W. (2d) 918.

We have, however, examined all of the special requests in the light of the charge of the judge to the jury and think that none of the assignments based thereon present reversible error. The charge fully and fairly covered all of the issues in the case.

The result is that the judgment is affirmed at the cost of the defendant.

Senter and Ketchum, JJ., concur.