# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY 21, 2010 Session

## LAURA WILBURN, as the Personal Representative of SON JONES, Deceased v. CITY OF MEMPHIS

### Direct Appeal from the Circuit Court for Shelby County
#### No. CT-007163-04      Charles McPherson, Judge

### No. W2009-00923-COA-R3-CV - Filed April 9, 2010

Decedent was struck and killed by an on-duty City of Memphis police officer while attempting to cross the street. The trial court awarded $7,500.00 in a wrongful death award. Decedent's personal representative appeals, seeking an increased award. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Walter Lee Bailey, Jr., Memphis, TN, for the appellant, Laura Wilburn

Roane Waring, III, Memphis, Tennessee, for the appellee, City of Memphis

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Son Jones ("Decedent"), a fifty-four year old man, was struck and killed by on-patrol Memphis police officer James Culpepper on December 21, 2003, while crossing the street in Memphis. Decedent's sister, Laura Wilburn ("Appellant"), as the Decedent's personal representative, filed a wrongful death action against the City of Memphis (the "City") on December 17, 2004.[1] Following a bench trial, the trial court found for Appellant on the issue of liability and awarded her $7,500.00.[2] Appellant timely appealed to this Court seeking an increase of the wrongful death judgment.

## II. DISCUSSION

On appeal, Appellant challenges the adequacy of the trial court's $7,500.00 judgment. Specifically, Appellant claims that the evidence presented regarding Decedent's pain and suffering, lost earning capacity, his mother's lost consortium, and his funeral and burial expenses justify an increased award. In its Order of Judgment, the trial court made no findings of fact.[3] Accordingly, our review is *de novo* without a presumption of correctness.[4] **Goodman v. Memphis Park Comm'n**, 851 S.W.2d 165, 166 (Tenn. Ct. App. 1992) (citing *Kelly v. Kelly*, 679 S.W.2d 458 (Tenn. Ct. App. 1984)). We will address each basis advanced by Appellant as warranting an increased judgment before reaching our conclusion as to the proper amount of damages, if any.

Wrongful death plaintiffs may recover two types of damages. **Thrailkill v. Patterson**, 879 S.W.2d 836, 839-40 (Tenn. 1994); *see also* T.P.I.-Civil 14.30 (2009). The first category of damages allows recovery for injuries sustained by the decedent from the time of injury

---

[1]The Complaint also named Officer Culpepper as a defendant, but he was later dismissed from the suit.

[2]The City states that it does not concede liability; however, its only argument regarding liability relates to Decedent's comparative negligence.

[3]The Order of Judgment was entered on April 17, 2009. Effective July 1, 2009, Tennessee Rule of Civil Procedure 52.01 requires that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." **Tenn. R. Civ. P. 52.01**.

[4]In its brief, the City suggests that this Court should afford the trial court's decision a presumption of correctness because Appellant failed to request that the trial court issue findings of fact. We reject this argument.

until the time of death. ***Jordan v. Baptist Three Rivers Hosp.***, 984 S.W.2d 593, 600 (Tenn. 1999). This classification allows recovery for medical expenses, physical and mental pain and suffering, funeral expenses, and loss of earning capacity during the period from injury to death. ***Id.*** (citing Tenn. Code Ann. § 20-5-113). The second category allows recovery for "incidental damages" sustained by the decedent's next of kin, and includes the pecuniary value of the decedent's life. ***Id.*** (citing Tenn. Code Ann. § 20-5-113; *Thrailkill*, 879 S.W.2d at 841; *Davidson Benedict Co. v. Severson*, 72 S.W. 967 (Tenn. 1903), *abrogated on other grounds by Jordan*, 984 S.W.2d at 598-99). "The 'pecuniary value' of a decedent's life represents the value of the decedent's probable future financial accumulations at the time of the decedent's death." ***McClanahan v. Clayton***, No. 01-A-01-9308-CV00371, 1994 WL 248183, at *3 (Tenn. Ct. App. June 10, 1994) (citing *Wallace v. Couch*, 642 S.W.2d 141, 143-44 (Tenn. 1982)). To determine the pecuniary value of the decedent's life, the court must consider the following factors: "the decedent's expectancy of life; age; condition of health; capacity for earning money through a skill, art, trade, profession, occupation or business; and personal habits regarding sobriety and industry." ***Hall v. Stewart***, No. W2005-02948-COA-R3-CV, 2007 WL 258406, at *3 (Tenn. Ct. App. Jan. 31, 2007). The pecuniary value of the decedent's life includes a value for the loss of consortium, ***Hunter v. Ura***, 163 S.W.3d 686, 705 (Tenn. 2005) (citing *Jordan*, 984 S.W.2d at 600), and a decedent's parents are included within the class of persons allowed to recover such damages. ***Hancock v. Chattanooga-Hamilton County Hosp. Auth.***, 54 S.W.3d 234, 236 (Tenn. 2001).

On appeal, Appellant claims that she was inadequately compensated under both classifications of damages. Regarding the first class of damages, Appellant argues that the trial court's judgment should be increased based on Decedent's funeral and burial expenses, as well as for his pain and suffering prior to death. At trial, Appellant testified to the following expenses: $2700.00 for the funeral; $500.00 for the burial; and $100.00 for the grave digging. Robin Askew, Decedent's live-in girlfriend, also testified that she gave Decedent's last $500.00 to the funeral home. However, no documentation confirming any of these amounts was presented.[5]

Appellant further contends that the "evidence is susceptible of supporting an inference that the decedent experienced conscious pain and suffering which stems from the violence of the impact itself." We disagree. The evidence established that Officer Culpepper was traveling approximately forty to forty-five miles per hour when he struck Decedent with his vehicle. Officer Culpepper testified that immediately following the accident, he "ran up" to

---

[5]In her answers to the City's interrogatories, Appellant stated: "The funeral cost approximately $3,000. LeMoyne College paid some of the expense, I paid some of the expense, and my brother's significant other paid a third of the expense. I will furnish copies of the billing for these expenses when I receive it."

Decedent and saw that he was deceased. Similarly, a witness to the accident testified that as soon as she saw Decedent's body hit the ground "his body, it was just like it exploded, his head and everything[,]" and Appellant acknowledged that Decedent was pronounced dead at the scene of the accident. "With respect to this first classification of damages, a wrongful death plaintiff may not recover damages for pain and suffering absent proof of conscious injury." **Knowles v. State**, 49 S.W.3d 330, 339 (Tenn. Ct. App. 2001) (citing *Hutton v. City of Savannah*, 968 S.W.2d 808, 811 (Tenn. Ct. App. 1997)). Appellant presented no evidence to refute the testimony that Decedent was killed upon impact. Because conscious injury has not been shown, nor can it reasonably be inferred from the evidence presented, recovery for pain and suffering is not available.

Next, Appellant argues that the second classification of damages warrants an increased recovery. Specifically, Appellant maintains that Decedent's lost earning capacity and his mother's loss of consortium support an increased award. At trial, Appellant testified that Decedent, who had completed only the sixth or seventh grade, was a conscientious employee, and that she believed Decedent was employed by LeMoyne-Owen College at the time of his death "doing some labor work or something like that[.]" Decedent's girlfriend also testified to Decedent's good work habits. She claimed that at his death he was employed to "[b]uild houses, and for Lemoyne-Owen Garden, and he was a plumbing carpenter, also." However, she stated that LeMoyne-Owen was his only income source. She maintained that Decedent "wasn't sick a lot[,]" that he "fairly consistently" earned $500.00 per week, and that he used that money to help her with household expenses.

Economic expert Gary Latanich testified at trial for the Appellant. Based upon Decedent's alleged income of $500.00 per week, or $26,000.00 per year, Dr. Latanich projected Decedent's lost earnings to be $134,167.[6] Dr. Latanich acknowledged that he was merely told that Appellant was earning $500.00 per week as a LeMoyne-Owen College employee at the time of his death, and that he had never verified that information. He also conceded that he never reviewed any documents, wage statements, "or anything like that" in making his projection, and that "[i]f the figures weren't [$]500, then the figures would have to be recalculated to be different reflecting what they really were."

At trial, the City submitted into evidence Decedent's "Employee History" records from LeMoyne-Owen College.[7] The employment record contained copies of Decedent's

---

[6]This figure accounted for inflation, interest earned, and consumption.

[7]The parties stipulated that the employment records obtained from LeMoyne-Owen College constituted all records maintained by the college regarding Decedent.

-4-

forty paychecks from September 2001[8] to November 2002. During those forty weeks, Decedent earned a total of $9354.00, averaging $233.85 per week. Appellant presented no documentation regarding any wages earned from November 2002 until Decedent's death in December 2003. Additionally, the City produced Social Security Administration records which call into question Decedent's employability, as well as his girlfriend's credibility. In 1998, when asked to describe an "average day" for Decedent, Decedent's girlfriend wrote:

> Watch[es] TV most of the day, walk[s] outside about 30 min[utes] at [a] time. Appears to be lost most the time. He tells me he can do things he tries to but cannot do [] them. [H]e gets very confuse[d] say[s] he has terrible headaches. Also tells me [he is] afraid to answer the door when he is alone. Tells me he does not know why. He fears things [he] cannot explain, but tells me his is not crazy. I just listen. I do not know what to say. He cannot read or write.

In 2001, Decedent's girlfriend described Decedent's "average day" as follows:

> Fix[es] food for himself, clean[s] room sometimes, dress[es] [him]self, bathes [him]self.

> No activities since f[oo]t surgery, doesn't walk any place anymore. Very quiet at times. Does not go fishing anymore.

Decedent's girlfriend also described him, in 2001, as unable to think very well at times, and she stated that he had Hepatitis C and stayed in his room most days. In December of 2001, Decedent, himself, also stated that he had been unable to work since November of 2000, describing his symptoms as "feet hurt, stay sore[,] upset stomach all the time" as well as "arthritis, knees hurt, ankles stiff, ulcer, hepatitis, diarrhea, vomiting a lot[.]" Decedent complained that he was "very nervous most of the time[,]" and that he could not look for a job because he had "to use [the] restroom often" and because he could not read or write to fill out applications.

Appellant also contends that the judgment should be increased based on the loss of consortium experienced by Decedent's mother. "Consortium encompasses the tangible services provided to the family by the decedent as well as the intangible benefits received by the family members, such as attention, care, guidance, protection, affection, companionship,

---

[8]One check dated September 2001 is included in the "Employee History." However, chronologically, the next check available is dated December 2001.

love, and training." **Hall**, 2007 WL 258406, at *3 (citing *Jordan*, 984 S.W.2d at 602). Filial consortium claims are available for the wrongful death of an adult child. **Ki v. State**, 78 S.W.3d 876, 879 n.2 (Tenn. 2002) (citing *Rothstein v. Orange Grove Ctr., Inc.*, 60 S.W.3d 807 (Tenn. 2001)).

In *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601 (Tenn. 1999), our Supreme Court set forth certain factors to consider regarding an adult child's claim for the loss of parental consortium. These factors include the closeness of the relationship and the dependency involved. **Id.** The Court acknowledged that "[t]he age of the child does not, in and of itself, preclude consideration of parental consortium damages[,]" however, "[a]dult children may be too attenuated from their parents in some cases to proffer sufficient evidence of consortium losses." **Id.** We find these considerations applicable to a filial consortium claim.

Before the trial court, Appellant testified that Decedent was "very close" to his mother, who was approximately one hundred and six years old at the time of Decedent's death. According to Appellant, Decedent saw his mother three to four times per week, and he helped her in her garden, took her to the store and fishing, and he cooked the fish for her. Likewise, Decedent's girlfriend testified that Decedent and his mother had a "beautiful" relationship, and that they saw one another "quite frequently." She stated that Decedent "sometimes" gave his mother money, but that she did not depend on him. Finally, in her deposition, Decedent's mother stated that Decedent "would come to see [her] every week, weekends" and that he visited "all day." She claimed that she depended on both Decedent and Appellant, and that Decedent took her fishing, "carr[ied] her places," bought her food, got her wood in the wintertime, washed her clothes, and would "sometimes" give her between five and one-hundred dollars.

Finally, we address the City's claims that the trial court impliedly "apportioned considerable fault to the deceased." Again, because the trial court made no findings of fact, our review is *de novo* without a presumption of correctness. The City bears the burden of proving Decedent's comparative fault. **See Banks v. Elks Club Pride of Tenn.**, 310 S.W.3d 214, 225 (Tenn. 2010).

In determining the percentage of fault assigned to each party a court must consider all of the circumstances of the case, including the following factors:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's

conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Eaton v. McLain*, 891 S.W.2d 587, 592 (Tenn.1994) (footnotes omitted).

Crump Avenue, on which the incident occurred, is a six-lane highway–three westbound lanes, three eastbound lanes, and a center turning lane. Based on the testimony of Officer Culpepper and the eye-witness, the incident occurred as follows: Officer Culpepper was proceeding southwest on Crump Avenue in the lane nearest to the turning lane at approximately forty to forty-five miles per hour.[9] Ms. Newton was traveling in the same direction as Officer Culpepper, at approximately the same speed, in the center lane of the three westbound lanes, no more than one car length behind Officer Culpepper. Moments before the incident, Officer Culpepper looked over to his left at a carwash that is "very well known to police officers, [as a] high drug, high crime area . . . . pretty much a gang front." It is unclear whether Officer Culpepper was looking at the carwash at the time of impact, but both Officer Culpepper and Ms. Newton testified that they did not see Decedent prior to impact. Officer Culpepper testified that he could not remember exactly what happened, only that he heard a noise and then his windshield shattered. He did not realize that he had hit a pedestrian until he looked in his rear view mirror and "saw [Decedent] rolling behind the squad car." Ms. Newton stated that "all of a sudden I just saw what appeared to be a garbage bag or paper bag or something go in the air." Officer Culpepper was unsure whether his headlights were on at the time of the incident, but he stated that it was "pretty well dark" and that his headlights come on automatically "when the light levels reach below a certain level."[10]

Tennessee Code Annotated section 55-8-135(a) provides that "[e]very pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway."

---

[9]The speed limit on Crump Avenue was apparently forty miles per hour.

[10]Officer Culpepper testified that the accident occurred at approximately 5:30 PM, but Ms. Newton placed the accident at between 8:30 and 9:00 PM.

Appellant maintains that Decedent was traveling within the unmarked crosswalk at the intersection of Crump Avenue and Polk Avenue, and thus, that Officer Culpepper had a duty to yield to Decedent. However, the City questions whether the intersection constitutes an "unmarked crosswalk" and, if so, whether Decedent was within the unmarked crosswalk when he was struck. Furthermore, the City contends that even if Decedent was within an unmarked crosswalk that he violated Tennessee Code Annotated section 55-8-134(b), which states that "[n]o pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield."

The Tennessee Pattern Jury Instructions define an "unmarked crosswalk" as "an unmarked portion of an intersection created by the imaginary lengthening or connection of sidewalk boundary lines where the roadways meet at approximately right angles [over which a pedestrian normally walks in crossing from a sidewalk on one side of a roadway to a sidewalk on the other side.]" T.P.I.-Civil § 5.21; *see also Lemons v. Memphis Transit Mgmt. Co.*, 413 S.W.2d 88, 98 (Tenn. Ct. App. 1966). Apparently, the City's argument that the intersection does not constitute an "unmarked crosswalk" is based on its "angular nature." Based on the photographs contained within the record, we find that the intersection at issue does constitute an unmarked crosswalk.

At trial, Ms. Newton viewed a photograph of the intersection, and she drew lines across Crump Avenue, connecting the sidewalks along Polk Avenue. She indicated that she believed Decedent was struck within these lines–within the unmarked crosswalk. In fact, when asked whether Decedent could have been hit outside of those lines, she answered that he could not have been because it was within those lines that she saw his body "[go] in the air." Based on this testimony, we further find that Decedent was struck within the unmarked crosswalk.

Because Decedent was within the unmarked crosswalk, Officer Culpepper had a duty to yield the right-of-way. *See* **Tenn. Code Ann. § 55-8-135(a)**. However, Decedent was not free to "'proceed serenely oblivious of surrounding circumstances[, because] . . . [he was] bound to exercise ordinary care for his own safety.'" ***Tri-State Transit Co. of La., Inc. v. Duffey***, 173 S.W.2d 706, 710 (Tenn. Ct. App. 1940) (quoting *Pryor's Adm'r v. Otter*, 105 S.W.2d 564, 567 (Ky. App. 1937)). "The obligation of a pedestrian at a street intersection is to exercise ordinary care which may, or may not, according to the circumstances, require that he look before proceeding or while in the course of crossing." ***Id.*** (citing 25 Am. Jur. 523, § 228).

We find that the exercise of ordinary care in this case required Decedent to check for

oncoming traffic before leaving the safety of the turning lane to cross three lanes of Crump Avenue. Decedent's apparent failure to do so was a departure from the required level of ordinary care. Accordingly, we find Decedent partially at fault for his injuries; however, because Decedent's negligence is less than that of the City, his fault does not prevent him from recovering, but merely reduces his award proportionately. ***See Lewis v. State***, 73 S.W.3d 88, 94 (Tenn. Ct. App. 2001).

After a *de novo* review of the evidence presented, including a proportionate reduction for Decedent's fault, we find $7,500.00 to be the appropriate award in this case. Appellant has shown only that Decedent earned slightly over $9,000.00 in 2002, and she neglected to submit documentation regarding any income earned during the year prior to his death. Likewise, she failed to substantiate her claims with respect to funeral expenses and burial costs, she failed to prove conscious injury, and the evidence presented regarding lost consortium is insufficient to support more than nominal damages.

## III. Conclusion

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Laura Wilburn, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.