HELVICH, APPELLEE, *v.* THE GEORGE A. RUTHERFORD CO., APPELLANT.

(No. 22794—Decided September 21, 1953.)

*Messrs. Endress & Endress,* for appellee.
*Messrs. Crossen & Chamberlin,* for appellant.

SKEEL, J. This appeal comes to this court on questions of law from a judgment entered on the verdict of a jury for the plaintiff in the Common Pleas Court of Cuyahoga County. The plaintiff's action sounds in negligence. He was a watchman employed by Ostendorf Morris, a building management organization which was employed by The Estates Holding Company to manage a six-story building at 1017 Euclid Avenue in Cleveland. The Estates Holding Company leased a storeroom in the most easterly part of the first floor which room included a balcony to the Eastman Kodak Stores, Inc. Prior to this lease to Eastman Kodak Stores, Inc., this storeroom was divided and had been occupied by two tenants, Dr. Scholl Foot Comfort Shop and Contour Chairs, Inc., contour chairs occupying the most easterly part of the divided room.

After Eastman Kodak Stores, Inc., leased the storeroom, they entered into a contract with The Geo. A. Rutherford Company to remodel the leased premises into a single storeroom. The Contour Chairs, Inc., moved out on Saturday, November 5, 1950, the shoe company having previously vacated their part of the storeroom. On Sunday, November 6th, the defendant, Rutherford, barricaded the entire front of the storeroom on Euclid Avenue, placing a small door in the barricade. The back door was also barricaded and both entrances were secured with a padlock, the keys being placed in the possession of Rutherford em-

ployees. The actual work of reconstructing and re-modeling the storeroom began on November 7th.

The duties of the plaintiff were those of a watchman. He ran the elevator from four o'clock in the afternoon until the employees working on one or two of the upper floors had left the building, took care of emptying paper baskets on one of the floors and, in a general way, watched over the premises until twelve midnight. On Saturday, his tour of duty began at twelve o'clock noon. He testified that for a part of the time his work day was extended to one o'clock a. m.

On Friday, December 1, 1950, the plaintiff testified that in the evening around 8:00 p. m. he discovered a leaking pipe in the basement near the rear of the last passenger elevator shaft. He said the water was "spraying" out of the pipe. He testified that he wrote a note to his boss telling him of the leak. He did nothing further about it until he returned to duty at noon on Saturday, December 2nd. He found a note from his boss about the leak which he gave to the plumber who was then on the premises doing work for Ostendorf Morris in parts of the building other than that rented to the Kodak Company. The plumber, upon receiving the note from the plaintiff (there is conflict in the evidence as to the time he got the note, the plumber testifying that it was at 8:00 a. m. when he came to work, the plaintiff saying it was shortly after 12:00 o'clock noon) went to the basement to check the difficulty. He determined that the leak was on the first floor and after trying unsuccessfully to get into the storeroom because of the entrances being locked, he asked the plaintiff if he knew how to get in. Whereupon the plaintiff took the plumber and his helper to a door leading from the public stairway (located in the rear of the building) to the balcony. On the second day of December, the partition between the two storerooms had been removed and, in furtherance of its

contract to remodel the storeroom for occupancy by the Eastman Kodak Stores Company, Rutherford had removed a part of the railing and some part of the outer edge of the floor of the balcony. The part removed was in that part of the storeroom formerly occupied by Contour Chairs Company, that is, on the east side of the room and between two supporting pillars. Directly to the east of the most easterly of these pillars, was a stairway leading from the ground floor to the balcony. The reason that the plaintiff took the plumbers to this balcony door was because it was not provided with a lock and it was therefore the only means he had of getting in.

When the plaintiff pulled the door open and stepped onto the balcony, it was "pitch dark" except for the light coming through the door through which plaintiff entered reflecting in a westerly direction. The plaintiff testified that there was a light switch on the most easterly of the two pillars above referred to, which was some sixty feet south of the door. The plaintiff had a flashlight which he turned on and started toward the place where he thought the light switch was located. Instead of using the flashlight to light his way, he threw the light along the east wall and walked forward without being able to see where he was going. He did not know or then discover that the railing had been removed and walked off the end of the balcony falling to the floor below whereby he was injured.

From a judgment entered for the plaintiff, the defendant claims the following errors:

1. The trial court committed error prejudicial to the right of the defendant, The George A. Rutherford Company in submitting to the jury the question of whether or not the plaintiff was acting in an emergency.

2. In failing to direct a verdict for the defendant be-

cause of the plaintiff's failure to establish any negligence on the part of said defendant.

3. In failing to hold as a matter of law that the plaintiff was himself guilty of negligence which was a proximate cause of the injuries complained of.

The first claim of error is well taken. The plaintiff's action is based on the claim that when he discovered water spraying from a pipe in the basement he was confronted with an emergency in which he was compelled to act at once to prevent waste which would be caused by water running into the basement and therefore, in going into that part of the building under lease to the Kodak Company in an effort to find the leak, he was a frequenter and entitled to be provided with a safe place to work as provided by law.

Whether or not the plaintiff was acting in an emergency is ordinarily a question of fact, but where the facts are not in dispute, it becomes a question of law for the court.

An emergency means an unforeseen occurence or combination of circumstances which calls for immediate action leaving no time for deliberation.

The rule is well defined by the tenth headnote in the Northeastern Reporter in the case of *Hedgecock* v. *Orlosky,* 220 Ind., 390, 44 N. E. (2d), 93 (Supreme Court of Ind. 1942) where it is provided:

"Before the doctrine of 'sudden peril' applies, it must appear that the peril was caused by the negligence of the defendant, the apprehension of peril, from the standpoint of the injured person, must have been reasonable, *and the appearance of danger must have been so imminent as to leave no time for deliberation.*" (Emphasis added.)

In 65 Corpus Juris Secundum, page 735, in Section 123, it is said:

"In order to relieve a person from the consequences

of his own acts on the ground that they were done suddenly and under impending danger, there must be either a real danger or the circumstances must be such as might create apprehension of danger in the mind of an ordinary prudent person, and the appearance of danger must have been imminent, leaving no time for deliberation. If there is time for him by the exercise of reasonable care to withdraw to, or to remain in, a place of safety he may not recover if he does not do so.''

See, also, 38 American Jurisprudence, 686, Section 41, and 38 American Jurisprudence, 874, Section 194.

The court granted some of the plaintiff's requests to charge before argument and charged the jury as to the definition of a frequenter as provided by Section 871-13, subsection 5, General Code, and the duty of an employer to protect the safety of his employees as defined by Sections 871-13, subsection 11, and 871-15, General Code. The sections referred to are a part of the chapter creating the Industrial Commission and providing a safety code for those engaged in industrial activities. The court also gave plaintiff's request to charge No. 6 which provided that by the laws of the state of Ohio published by the Industrial Commission of Ohio and the department of Industrial Relations in Bulletin 202, the defendant was required to comply with the following rule:

''All work places, stairways, corridors and passageways where workmen must frequent, pass or use in performance of their work, or, in the passage to and from their work shall be kept reasonably lighted, except as otherwise provided by law.''

Nowhere in the court's charges as requested by plaintiff, or, in its general charge are the exceptions enumerated or explained so that the giving of such charge without explaining what is meant by the words ''except as otherwise provided by law,'' was prej-

udicial. The court also charged as requested by the plaintiff before argument, the substance of Sections 264 and 265 of Bulletin 202, issued by the Industrial Commission, providing in part that *platforms, runways, ramps, scaffolds and similar equipment,* which are ten feet or more from the ground or over water, deep holes, etc. shall be provided with guard rails not less than 36 inches or more than 46 inches from the floor of the described places. These sections are a part of the construction safety code and have absolutely no application to permanent parts of a building either while under construction or reconstruction, and refer to contractors' equipment. This is made to appear by the fact that these sections are now a part of Chapter 8 of Bulletin 202 as re-enacted by the commission, September 30, 1952, effective January 1, 1953, without a single change in content and are now known as Sections 186 and 187, being styled *"Scaffolds, Ramps, Runways,—."* These sections in Bulletin 202 have no application to the facts in the case now before us and their inclusion in the charge constitutes error prejudicial to the rights of the defendant.

The court, in concluding the special instructions before argument given at plaintiff's request, instructed the jury that if the plaintiff was acting in an emergency not created by his own negligence, and he failed to act reasonably or as a prudent person would be likely to act when confronted by a similar circumstance, then he would be negligent, but, if, under the circumstances, he, when confronted with an emergency, if such there was, acted reasonably as would a prudent person under like circumstances, then, he could not be charged with *contributory* negligence.

The court in its general charge specifically included all the special instructions and further charged that at common law the owner of property was entitled to protect it against waste or damage by persons in pos-

session under lease or otherwise. The court said: "Such owner need not sit idly by and permit the destruction of or serious damage to such property if he has knowledge thereof, and can, by reasonable intervention, prevent waste and possible damage.

"If the situation discovered is such as to constitute an emergency requiring immediate repairs or precaution, the landlord or his servant would be authorized to forthwith institute such repairs or precautionary moves.

"On the other hand, if the situation discovered is one not requiring immediate repairs, as an emergency, the owner would be required to make such repairs during the time prescribed by the lease between the parties * * *."

Paragraph 15 of the lease (introduced in evidence) in part provides: "The lessor shall further have the right to enter the demised premises at all *reasonable hours* for the purpose of making repairs * * * necessary for the safety * * * of said building * * *."

The court then instructed the jury that it was its duty to determine the status of the plaintiff when he went upon the balcony the afternoon of December 2, 1950 and that his status would depend upon whether or not an emergency existed. If it did, he would be a frequenter and, under such circumstances, the defendant would owe him the duty of exercising ordinary care for his safety, including the duties imposed upon employers by the statutes and rules of the Industrial Commission as explained in the special instruction before argument and hereinabove referred to. But, if the plaintiff failed to show by the preponderance of the evidence that he was acting under an emergency, then he would have no right to enter the Kodak store except during reasonable hours of the working day and to do otherwise would make him a trespasser. The court then charged the jury that the only duty

which the defendant would owe plaintiff as a trespasser would be not to wilfully or wantonly cause him injury and, there being no evidence to support a wanton or wilful injury, if the plaintiff was a trespasser, the jury's verdict should be for the defendant.

In considering the defendant's duty toward the plaintiff in the event the jury should find him to have been a frequenter, the court said:

"Whether or not the defendant exercised ordinary care with respect to such duty is a *question of law* which the jury will be required to determine." (Emphasis added.)

Such a statement is hard to explain in a charge so carefully prepared as this one. But that is the way the record is certified to us. Such a statment is clearly erroneous.

It is evident from the foregoing portions of the charge that the jury was instructed to determine from the evidence whether or not the plaintiff was faced with an emergency requiring immediate action for two reasons. First, to determine the status of the plaintiff when he entered the balcony and, second, to judge whether his conduct on the balcony squared with ordinary care under the circumstances.

Except as provided for by the terms of the tenancy, a landlord ordinarily has no right to go upon the demised property. One general exception to the rule as thus stated is to prevent waste. In 51 Corpus Juris Secundum, page 991, Section 318, it is provided: "Subject to some qualifications, the landlord has no right of entry and the lease does not contain a reservation of right. * * * According to some authorities however, the landlord may, without incurring liability as a trespasser, enter upon the demised premises during the term to demand the payment of rent when due, *to prevent waste* * * *." *Flanders, Admr.,* v. *New Hampshire Savings Bank,* 90 N. H., 285, 7 A. (2d),

233; 32 American Jurisprudence, page 185, Section 195; 10 A. L. R., 711; *Forsythe* v. *Shryack-Thom Grocery Co.,* 283 Mo., 49, 223 S. W., 39.

This brings us to a consideration of the evidence as it has to do with the questions of whether waste was being committed and whether, if so, it presented an emergency requiring immediate action whereby (as the court charged the jury) he would, in going upon the balcony, be a frequenter and not a trespasser.

In considering this part of the case all doubts as to the weight and credibility of the evidence must be re-resolved in favor of the plaintiff, but this does not mean that the court must accept the impossible as true. The plaintiff testified that about 8:00 p. m. of December 1st, he found a water pipe in the basement near the rear passenger elevator shaft ''spraying'' water so much so that the water on the basement floor was 3 or 4 inches deep for a radius of 20 feet. How this could be so on a flat basement floor is hard to understand. The accuracy of this testimony is also challenged by the fact that directly thereafter, he testified that no water had run into the elevator pit only 10 feet away. His corroborating witness, the plumber, said, ''There was quite a lot of water down there on the floor so I should say it would spread over an area of some 20 feet each way.'' And again he said, ''There was a valve on there that wasn't functioning right; you couldn't turn it off tight at all, no matter how tight you turned it the water kept on running.''

''Q. Was is running out there? A. Well, it was nothing that would raise a big amount of water, but a continuous little stream running all the time.''

The evidence is undisputed that the plaintiff first noticed the leak Friday night, December 1st, at about 8:00 p. m. He says he put a bucket and a wheel barrow under it and both were full and had to be emptied befor quitting time at 1:00 a. m. All he did about it was

to write a note to his boss. He did not return to work until 12:00 noon on Saturday, December 2nd. He found an answer to his note which he gave to the plumber and it was not until an hour later that he tried to show the plumber how to get to the first floor in the Kodak storeroom through the balcony, all other doors being locked. The place where the water was leaking was on the first floor in the premises of the Kodak Company and the place in the basement where the water was falling was also in the possession of the Kodak Company under the lease. It should be noted also that the "boss" did not contact the plumber who was on the job at 8:00 a. m. that morning. All he did was to leave an answer to the plaintiff's note, knowing that the plaintiff would not be there until noon that day. This is conclusive evidence that he was not concerned about waste and did not consider the situation an emergency. There is, therefore, no evidence of an emergency. One who finds a leak at 8:00 p. m. on December 1st, and does nothing to help stop it until 1:00 p. m. the next day certainly was not hard pressed for time, nor much concerned about any supposed waste. We are unable to find any evidence of any waste to the building, or its contents, or that the plaintiff was upon the premises to deal with an emergency.

For the foregoing reasons, giving the plaintiff's evidence its most favorable construction in his favor, he was, as a matter of law, a licensee when he went upon the balcony and the defendant's duty in protecting him from harm was not to wilfully cause him injury. It being admitted that there was no evidence to support a wilful injury, the court should have directed a verdict. The defendant's first claim of error is therefore well taken.

The claim of error that the plaintiff was himself guilty of negligence as a matter of law must also be sustained. Here again, there is no conflict in the evi-

dence. We begin with the fact, as above determined, that the plaintiff was not acting under the stress of an emergency. When he opened the door from the rear stairway onto the balcony, except for the light coming through that door, the room on the balcony was "pitch dark." It was so dark that the plumber who was with the plaintiff, sent his helper for a "big flashlight." The plaintiff, however, did not wait the helper's return. He took out his own flashlight, but did not use it to light his way. He held it so that the light would play on the wall to his left and not the floor in front of him. Then, in total darkness, he walked forward 60 feet without being able to see or to discover that the defendant, in furtherance of its contract, had removed the railing at the point of the balcony toward which plaintiff was walking. In addition to these facts, the plaintiff also testified that he knew the defendant was remodeling the storeroom, that he had not been in the room after the work had been begun and knew nothing of the extent and character of the changes being made.

The plaintiff's evidence, therefore, is that he walked forward in total darkness giving himself no help from a flashlight which he had in his hand in a place the condition of which he was unfamiliar with and had no right to assume was the same as when he had previously been there. Certainly such conduct at least raises an inference of negligence which the plaintiff in no way attempted to dispel by other evidence.

In the case of *Huyink* v. *Hart Publications, Inc.,* 212 Minn., 87, 2 N. W. (2d), 552, the plaintiff, a meter reader, entered defendant's basement where he had gone for the first time to read the water meter. He did not turn on the lights, but instead moved about the basement, which was dark, in search of the water meter, using a flashlight to illuminate the walls, but not the floor where he was walking and as he thus proceeded fell into a furnace pit. It was held that the

plaintiff was guilty of contributory negligence as a matter of law. See 163 A. L. R., annotation page 587 at page 598. The first paragraph of the syllabus of the case reported in 212 Minn., 87, provides:

"1. Where plaintiff, to read a water meter, entered a dark basement with which he was unfamiliar and which he could have lighted, but did not, and moved about in search of the water meter, using a flashlight to illuminate the walls, but not the floor, as he proceeded, in the course of which he fell into a furnace pit, he was guilty of contributory negligence as a matter of law."

In the case of *McKinley* v. *Niederst*, 118 Ohio St., 334, 160 N. E., 850, the plaintiff walked out of her apartment on the second floor of defendant's apartment building in "total darkness" and in trying to reach for the stair post walked into the stairway and fell to her injury. The court said in the second paragraph of the syllabus:

"2. The testimony of a plaintiff, tenant in an apartment house housing several tenants, with halls and stairways in common, that she passed out of her apartment into a hallway in total darkness, with full knowledge of the existence of a stairway leading downward only a few steps from the door of her apartment, and proceeded forward in the direction of such stairway seeking to descend the same and fell to her injury, raises an inference of negligence on her part, which, in the absence of any evidence tending to refute such inference, justifies the trial court in directing a verdict in defendant's favor."

Also, in the case of *Flury* v. *Central Publishing House*, 118 Ohio St., 154, 160 N. E., 679, where the plaintiff was attempting to repair the heating system and in following a heating pipe opened the door to an elevator shaft which as he looked in was in total darkness. He stepped in, falling to the bottom of the shaft

and was injured. The court said in the third paragraph of the syllabus:

"3. The testimony of a plaintiff invitee, in an action for negligence, that from a lighted room he opened a closed metal-covered sliding door, was confronted with total darkness beyond the door, that he then stepped into such total darkness, to his injury, without any knowledge, information or investigation as to what such darkness might conceal, raises an inference of negligence on his part which, in the absence of any evidence tending to refute such inference, will require a directed verdict for the defendant."

The law of the foregoing Ohio cases was reviewed and approved in the case of *Johnson* v. *Citizens National Bank of Norwalk,* 152 Ohio St., 477, 90 N. E. (2d), 145.

Upon the authority of the foregoing cases and in the light of the facts as testified to by the plaintiff and his witnesses, we hold that the plaintiff's evidence raises an inference of negligence on his part which he in no way attempterd to dispel or counterbalance and, for that reason, the court should have directed a verdict for the defendant.

The third claim of error deals with the question of whether or not the defendant was guilty of negligence in failing to place a temporary barricade in front of the place on the balcony where the railing had been removed before leaving the job at the end of the day's work. Here again, the evidence is not in dispute. The storeroom was closed to the public. Its entrances were barricaded and no one was "invited to enter" except those engaged in remodeling the room. The defendant was the general contractor employed by the Kodak Company to do the remodeling. One of the requirements of the defendant's contract was to remove the railing in question and extend the balcony. This work was in progress to the extent of removing the

railing at the close of work on December 1st. When a property is under construction, there are, of necessity, hazards created as the work progresses which are only eliminated by its completion. Anybody who goes upon such property with knowledge that it is under construction must meet with and guard himself against such natural and necessarily created dangers. A contractor is not compelled, in the exercise of ordinary care, to guard against such natural dangers after the work day is over and the property is' closed for ordinary purposes to business visitors, licensees or frequenters.

The right of the landlord or his servants to go upon the premises to inspect or make repairs as provided by the lease, must be exercised at reasonable times of the business day except in case of emergency. Here, as we have held, no emergency was shown.

We conclude, therefore, that there is no evidence of negligence shown on the part of the defendant, The Geo. A. Rutherford Company. The judgment of the Common Pleas Court is therefore reversed and final judgment entered for the defendant-appellant.

*Judgment reversed.*

KOVACHY, J., concurs.

HURD, P. J. (Dissenting as to final judgment for defendant.) I dissent from the holding of the majority that there is no evidence of negligence on the part of defendant and that plaintiff was himself guilty of negligence as a matter of law, and that therefore the trial court erred in failing to direct a verdict for defendant-appellant, Rutherford. In my opinion the record shows questions of fact for determination of the jury in respect to such issues under proper instruction of the court.

I concur with the majority in that there were errors of law prejudicial to the defendant, as I think the court erred in holding the defendant subject to certain specific safety requirements relating to building and construction work contained in Bulletin 202 issued by the Industrial Commission of Ohio, both in the charges before argument and in the general charge for the reason that said specific requirements are not applicable to the facts and circumstances of this case.

In my opinion the cause should be reversed only and remanded for further proceedings according to law.