Clara **GOODMAN**, Plaintiff/Appellee,

v.

**MEMPHIS PARK COMMISSION and City of Memphis, A Municipal Corporation, Defendants/Appellants.**

Court of Appeals of Tennessee,
Western Section.

Nov. 10, 1992.

Application for Permission to Appeal
Denied by Supreme Court
Feb. 22, 1993.

Robert M. Fargarson, Monice Moore Hagler, Memphis, for defendants/appellants.

Larry A. Weissman, Memphis, for plaintiff/appellee.

TOMLIN, Presiding Judge, Western Section.

Clara Goodman ("plaintiff") brought suit against the Memphis Park Commission and the City of Memphis ("defendants" or "City") in the Circuit Court of Shelby County. She sought damages for personal injuries she sustained on falling down an unlighted flight of stairs at a city-operated senior citizens center. Following a bench trial, the court found in favor of plaintiff, awarding her a judgment for $20,000. By its appeal, City has raised a singular issue: whether the trial court erred in failing to find plaintiff guilty of proximate contributory negligence such as would bar her recovery. In our opinion, the trial court erred.

Most, if not all, of the facts are undisputed. On the day the accident took place, plaintiff went to the Lewis Senior Citizens Center to begin an art framing class. The class itself was to be held in a former residence located next door to the center. Plaintiff arrived some ten minutes before the scheduled time for the class to begin, and sought entrance through the front door, as she had been instructed to do. Finding the door locked, plaintiff went to the rear door, through which she had never before entered the building. Upon entering through the rear door, she found herself in a foyer or enclosed porch, on the other side of which were three doors. Two were completely closed and one, with a hasp latch on it, was slightly ajar.

Plaintiff thought she heard voices coming from behind the door that was slightly ajar. She called out, but no one answered. She approached this slightly ajar door, took hold of its doorknob, and pushed on it. At the same time she stepped into the opening and fell down a flight of stairs to the basement below. Plaintiff stated that the foyer in which she had been standing was well-lit, but the stairway into which she fell was in total darkness. The next thing she recalls was being carried out of the basement. Plaintiff, who was then 79 years of age, suffered injuries which required her hospitalization. This suit followed.

In her complaint, plaintiff alleged that defendants were negligent in (1) failing to inspect the entrances and stairwells of the center, (2) failing to unlock the doors to the appropriate entrances, and (3) failing to give warning. In their answer, defendants alleged plaintiff was guilty of proximate contributory negligence that caused or contributed to her injuries, and in addition, that plaintiff had assumed the risk.

As the trial court made no findings of fact, there is nothing in this record upon which the presumption of correctness contained in Rule 13(d) T.R.A.P. can attach. Accordingly, we will review the record *de novo*, without a presumption. *Kelly v. Kelly*, 679 S.W.2d 458 (Tenn.App.1984).

We no longer have to deal with the question of whether plaintiff was "an invitee" or "licensee." These classifications are no longer germane in this state in assessing the duty of care owed by a landowner to the person injured. The duty owed is one of reasonable care under all the attendant circumstances, with foreseeability of the presence of the visitor and likelihood of harm to him or her being one of the principal factors in assessing liability. *Hudson v. Gaitan*, 675 S.W.2d 699, 703 (Tenn.1984). However, the defense of contributory negligence continues to be available to the landowner in all such cases. *Hudson, supra.*

The pivotal issue in this case is whether plaintiff's actions under the circumstances constituted contributory negli-

gence that in any way proximately and directly contributed to the accident and her ensuing injuries. Plaintiff's own testimony at trial and in her discovery deposition reveal what happened that day. On direct examination, plaintiff testified as follows:

Q. Now, this class, was it in the main building or was it in the outside residence?

A. It was in the old rabbi's residence adjacent to the Lewis Center.

Q. You said you had other classes there. Did you have other classes in the rabbi's residence or in the main building?

A. The Lewis Center.

Q. Is that the main building?

A. Ceramic and jewelry art and arts and crafts in the Lewis Center, the old synagogue.

Q. Now, what time was your class supposed to start on June 22?

A. Nine.

Q. How did you get out there that day?

A. The Lewis Center bus or van, whatever picks us up and then brings us home in the afternoon.

Q. And do you know about what time you get out there that morning?

A. Yes, sir, because Robert was a little earlier—the driver was a little earlier that morning, and I remember looking at my watch, and it was ten minutes until nine.

Q. What did you do when you got off the bus?

A. I went in and said hello to a couple of the women that I know.

Q. Went in where?

A. In the Lewis Center. Then I walked on over to the old synagogue.

Q. The rabbi's residence?

A. The old rabbi's residence.

Q. What door did you go to?

A. I went to the front door which I was instructed to do.

Q. What did you find when you got to the front door?

A. The front door was locked, and I knocked on the door repeatedly, and there was somebody, some man in the building, but he never did come to the door. So I just walked around to the back.

Q. What did you find when you got to the back door?

A. the back door was open, and I walked up the steps.

.     .     .     .     .

Q. Now, the door you said was open; is that right?

A. Yes, sir, wide open.

Q. Wide open?

A. Yes, sir.

Q. Now, then you went into the building?

A. Yes, sir.

Q. What did you find when you got into the building? What did you see?

A. I walked into the building, and the doors in front of me, two of them were completely closed, and the one on the left, the hasp was lying away from—you know, had already come away from the door. It was open about, I would say, a 16th of an inch just enough to tell it was open. I hollered out and said, Is there anyone here, and it sounded like somebody said something. So I just took my left hand and got a hold of the doorknob, and I was going to step up on what I thought was a platform. I thought it was a hall, and I pushed the door open, and when I did, I just fell down the steps, and that's all I remember.

.     .     .     .     .

A. Mr. Weissman, could I say something?

Q. Yes, ma'am.

A. I had never come in that back door until the day I was hurt. I don't know where—

Q. Had you been in that building before?

A. One time.

Q. How did you get into the building?

A. The front door....

On cross-examination, plaintiff testified further about the circumstances surrounding her fall down the stairs as follows:

Q. Now, on the day of the accident you state you had gone to the front door

because that's where you were told to go?

A. Yes, sir.

Q. You had not been told to go to the back door, had you?

A. No.

Q. And you had never gone to the back door previously, had you?

A. No.

Q. And did you go back to see if there was anyone at the Lewis Center that could get you in the front door?

A. No, because when I knocked on the front door I saw some man up there in the room. That's the reason I walked around to the back.

Q. Now, you told me in your deposition you couldn't tell anybody was in there from the front door?

A. In my deposition?

Q. Yes. You told me you couldn't tell anyone was in the building from the front door.

A. I don't remember telling you that.

Q. Well, let me read it to you and see if—

A. I saw somebody. I don't know who it was, but there was somebody in that room.

MR. FARGARSON: Page 17 and also page 18.

Q. (By Mr. Fargarson) "And you went to the front door which you were told to do and it was locked?"

Answer: "Yes, sir."

Question: "Did you knock on the door or try," and your answer was: "Yes, sir, several times."

Question: "Well, could you tell whether anyone else was in the building?"

Answer: "Not at the front door I couldn't, no."

. . . . .

Q. You didn't knock on the door, you just called out?

A. That's right.

Q. And asked is anyone here?

A. That's right.

Q. And you say you thought you heard something?

A. Yes, sir.

Q. And you say you thought it was behind the door in front of you?

A. It sounded like it was coming from that direction.

Q. But you don't know what they said, do you?

A. No, sir.

Q. You just thought you heard a noise really, didn't you?

A. I thought I heard somebody talking, but I don't know what they were saying.

Q. Now, then do I understand you saw the door, and it was a little bit open?

A. Just a fraction of an inch.

Q. Just a fraction of an inch. You opened the door, and it was dark?

A. I walked to that door, and it was open about a fraction of an inch. I put my hand on the doorknob, and I had my right foot ready to step on a platform. When I put my hand on that doorknob, the door went open, and I fell.

Q. Well, did you step or did you just push the door open and fall head first?

A. When I got a hold of the doorknob evidently it pushed open, and when I stepped I fell.

Q. So, you did at least two things. You pushed the door open, and you stepped?

A. Yes.

Q. And you thought there was going to be a platform?

A. Yes. I didn't know there was a basement there.

. . . . .

Q. Now, you told me in the deposition that it was dark?

A. It was dark.

Q. As a matter of fact it was pitch dark?

A. I don't remember saying pitch dark, but it was dark.

Q. But you couldn't see anything inside?

A. No.

Q. It was that dark, wasn't it?

A. That's right.

Q. Although in the area where you were it was lit. There was plenty of light, wasn't it?

A. That's right.

.   .   .   .   .

Q. Now, as a matter of fact, Ms. Goodman, before the accident you had never opened any of those three doors, had you?

A. No, sir. I had never come through the back before.

Q. And before the accident you didn't know what was behind any door?

A. No, sir.

In addition to the above, portions of plaintiff's discovery deposition concerning the accident were read into the record:

Question: "Okay. And do I understand that you hollered something or knocked on the door?"

Answer: "Yes, sir. I didn't knock on the door; I hollered and said, Is anybody here."

Question: "And what was answered back to you?"

Answer: "I don't know. I just thought—I believed I heard somebody through the door, and that's the reason I opened the door."

"Okay. What did you hear? Tell me what."

Answer: "It just sounded like somebody, somebody talking."

Question: "You didn't—did anybody appear to answer you?"

Answer: "No, no. It just sounded like somebody was talking."

Question: "So you thought you heard some noise?"

Answer: "Yes, sir, yes, sir."

Question: "On the other side of the door?"

"Yes, sir."

Question: "But no one said, we are here?"

Answer: "That's right."

Question: "All right. As far as you know no one answered your question, is anyone here."

Answer: "That's right."

Question: "But you thought you heard something?"

Answer: "Yes, sir."

Question: "And was the area at that point where you were standing well lit?"

Answer: "Oh, yes, sir."

Question: "And you could see the door handle and everything?"

"Oh, yes, sir."

Question: "Clearly?"

Answer: "Yes, sir."

Question: "So do I understand then that you opened the door that was to your right as you were facing the doors or did you open the door to your left?"

"As I was facing the door—wait just a minute. It was to my left."

Question: "So you opened the door on your left?"

Answer: "Yes, sir."

Question: "That you were looking at?"

Answer: "Yes, sir."

Question: "Now, when you opened the door was it well lit? Was it dark? How would you describe what was—"

Answer: "It was completely dark."

Question: "It was completely dark?"

Answer: "Yes, sir."

Question: "Did you look for a light switch?"

Answer: "Mr. Fargarson, the last thing I remember was opening the door, and the next thing I remember was they were bringing me up the steps with my back all cut up and everything and my shoulder broken. That's all I remember."

Question: "Okay. Well, I know you may not remember much, but understand I'm going to have to ask you some questions about it."

Answer: "Oh, yes, sir."

Question: "And you answer them as well as you can. You opened the door that you thought you heard voices at?"

Answer: "That's right."

Question: "Now, you had to pull the door open enough?"

Answer: "Oh, no, sir. You open the—push the door open."

Question: "You push the door open?"

Answer: "Yes, sir."

Question: "Did it have a handle so that you had to turn the lock?"

Answer: "The door was open about this much (Indicating) Mr. Fargarson."

Question: "Well, did you just push the door open and immediately step?"

Answer: "I pulled open—I took a hold of the handle, and I pushed it, and that's all I remember."

Question: "So you don't know whether you stepped or whether you went over head first or what?"

Answer: "The next thing I remember I was lying—I was coming up the—they were bringing me steps. That's all I remember. I'm sorry. I don't remember anything, but that's all I remember."

Question: "But when you pushed the door open you knew it was dark?"

Answer: "Oh, yes, sir."

Question: "And you couldn't see anything?"

Answer: "No, sir. I didn't have—"

Question: "And you don't know whether you went into the room head first or whether you took a step and missed a step and tripped?"

Answer: "I opened the door, and I started to step in. That's all I remember. I remember them bringing me up the steps."

Question: "Now, you say you started to step in. Do you know which foot?"

Answer: "I stepped in, yes, sir."

Question: "You did step in?"

Answer: "And I thought there would be a platform there, but there was no platform there. The steps come all the way up to the opening."

Question: "Which foot did you step in with; do you know?"

Answer: "I would say the right. I don't remember."

Question: "And which hand did you use to push the door open?"

Answer: "My left."

Question: "And did you have a purse in your hand?"

Answer: "Oh, yes, sir."

Question: "Did you have—"

Answer: "A shoulder thing."

Question: "Did you have hold of the door frame or anything with your other hand as you opened the door?"

Answer: "I don't remember."

Question: "Did your right foot—did you feel it make contact with anything?"

Answer: "Mr. Fargarson, I'm sorry. I opened the door. I thought I would be stepping onto a platform, and that's all I remember. I stepped in. The next thing I remember they were bringing me up the steps."

We have found no cases from this jurisdiction dealing specifically with this or a similar fact situation. However, there are cases from other jurisdictions that are closely akin to the facts of the case at bar and that apply the correct principles of law. In *Tempest v. Richardson*, 5 Utah 2d 174, 299 P.2d 124 (1956), plaintiff filed suit to recover for injuries received in falling down a staircase leading to the basement while a guest in defendant's home. The trial court granted summary judgment for defendants based upon the pleadings and plaintiff's deposition.

Plaintiff's deposition disclosed that on the night of the accident, she announced to her hostess that she was going to the bathroom:

> Her hostess called out there was a light on in the bathroom. Appellant saw a light in a room in a hall running off the utility room but when she looked in through the door of that room she saw it was a den or a bedroom and decided that a closed door a few steps beyond the den must be the bathroom and proceeded thereto, opened it and stepped in, intending to turn on a light. The stairway was constructed without a landing and the door opened inwardly, and as she stepped in she fell down the stairs ... As she never saw the bathroom, appellant does not know whether it was lighted.

*Id.* 299 P.2d at 125.

Appellant contended she should have been warned of this dangerous condition.

In holding that the trial court did not err in granting summary judgment, the Utah Supreme Court stated:

Had appellant exercised ordinary and reasonable care for her own safety she would not have opened a door and stepped into a dark and unlighted area with which she was unacquainted, without first ascertaining what was beyond the door even though she had not been told that the room to which she was going was lighted.

*Id.* at 125.

*Accord: Whitman v. W.T. Grant Co.*, 16 Utah 2d 81, 395 P.2d 918 (1964); *Black v. Nelson*, 532 P.2d 212 (Utah 1975).

In *Flury v. Central Publishing House*, 118 Ohio St. 154, 160 N.E. 679 (1928), plaintiff was employed by a company repairing the heating system of defendant's building. After going to the basement by way of a stairway leading from the press room, he returned to the press room by the same stairway. After working on the steam lines in the press room, he found himself on the opposite wall from where he had previously entered. In this wall was a metal covered door, sliding on steel tracks. He opened this door and immediately fell down an elevator shaft and was injured.

In his suit against defendant, plaintiff contended that defendant was negligent in maintaining such a device without any warning to anyone unfamiliar with the premises that a shaft was behind the door. Following a jury verdict for plaintiff, on appeal the Ohio Court of Appeals held as a matter of law that plaintiff had been guilty of contributory negligence.

In affirming the Court of Appeals, the Ohio Supreme Court stated:

Remembering that this accident occurred about the noon hour, that this plaintiff entered the elevator shaft from a room sufficiently lighted, either by natural or artificial means, or both, to enable the operation of printing presses therein, ... his testimony that after opening the door he took 'one step' into total darkness, without investigation by sense of touch, procuring of a light, inquiry from the defendant's employees close at hand, or in any other manner, raises an inference of the absence of that degree of care on his part that an ordinarily prudent man would have exercised under the there existing circumstances—an inference of negligence on his part proximately contributing to his injury.

He did not fall because of the unlocked door, but because of the 'one step' he took into the darkness.

*Id.* 160 N.E. at 682.

*Accord: Helvich v. George A. Rutherford Co.*, 96 Ohio App. 367, 114 N.E.2d 514 (1953).

In *Felix v. O'Brien*, 413 Pa. 613, 199 A.2d 128 (1964), plaintiff obtained a jury verdict against defendant for injuries received when she fell down the stairs in plaintiff's home. Defendant had invited plaintiff to her home. It was the first time plaintiff had ever been there. Plaintiff asked defendant about the location of the powder room, defendant replied, "Right around the corner." Plaintiff then exited through a door into a hall and opened an unmarked door to the immediate right of the room from which she had come. The door actually led to a cellar stairway, but plaintiff did not know this. When she opened the door, she proceeded as though she were walking into a room. The area beyond the door was dark, but plaintiff did not reach for a light switch. Just inside the doorway was a step down to a landing some two by three feet, then a flight of stairs down from the landing. Plaintiff fell down the steps, causing her injuries.

The Pennsylvania Supreme Court found that there were no conditions existing that would require the imposition of liability as to the defendant. Having so stated, the court proceeded:

Moreover, even assuming that a case of negligence has been made out, we are compelled to conclude that plaintiff is barred from recovery because of her contributory negligence ...

Plaintiff apparently had misinterpreted Mrs. O'Brien's direction when she opened the cellar door. But regardless of her interpretation, she should not have disregarded what her own senses must have revealed to her—that there was nothing but darkness beyond the door in a home she had never visited before. She testi-

fied that when she opened the door, it was dark, and she 'stepped as though you would step into a powder room taking it for granted that there was a floor there....' In total disregard for her own safety, she moved ahead before attempting to turn on the lights.

.    .    .    .    .    .

The rule is that darkness, in itself, constitutes a warning to proceed either with extreme caution or not at all. *Barth v. Klinck,* 360 Pa. 616, 62 A.2d 841 (1949). As we said in *Barth* (360 Pa. at 618, 62 A.2d at 842):

> Accordingly, it is generally held, in the absence of evidence of a compelling necessity, that one who follows an unfamiliar course in the dark or steps into darkened and unfamiliar space, relying upon his sense of touch instead of obtaining and using adequate lighting facilities, and sustaining personal injuries, is guilty of contributory negligence as a matter of law.

*Id.* 199 A.2d at 130–31. *Accord: Just v. Son's of Italy Hall,* 240 Pa.Super. 416, 368 A.2d 308 (1976). After reviewing the testimony of plaintiff, the conclusion is inescapable that she was guilty of contributory negligence that proximately and directly contributed to her injuries. Accordingly, the judgment of the trial court is reversed and plaintiff's suit is dismissed. Costs in this cause on appeal are taxed to plaintiff, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.