# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

IN RE: D.R.B.     )
          )
ROCKY MICHAEL BRUCE and )
CHERYL BRUCE     )
          )
  Petitioners/Appellees,  )  Appeal No.
          )  01A01-9802-JV-00105
v.         )
          )  Warren Juvenile
ANGELA JACOBS    )  No. 1305
          )
  Respondent/Appellant.  )

**FILED**

**August 17, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

APPEAL FROM THE JUVENILE COURT
FOR WARREN COUNTY

THE HONORABLE BARRY MEDLEY PRESIDING


G. KLINE PRESTON, IV
WASHINGTON SQUARE TWO
222 2ND AVENUE NORTH
SUITE 416
NASHVILLE, TENNESSEE 37201

ATTORNEY FOR PETITIONERS/APPELLEES


CHARLES S. RAMSEY, JR.
114 NORTH SPRING STREET
P.O. BOX 687
MANCHESTER, TENNESSEE 37355

ATTORNEY FOR RESPONDENT/APPELLANT

**AFFIRMED AND REMANDED**

        PATRICIA J. COTTRELL, JUDGE


CONCUR:

KOCH, J.
CAIN, J.

# OPINION

This dispute over the custody of a minor child arose after the paternal grandparents filed an intervening petition for child custody. They were granted temporary custody of the child pending a hearing on the matter. After two hearings, the trial court ordered that custody remain with the paternal grandparents pending the results of home studies of each party seeking custody, i.e., the mother and the paternal grandparents. The trial court held additional hearings after receiving the results of the home studies and awarded custody to the paternal grandparents. We affirm the trial court.

The minor child, D.R.B., was born in Michigan December 24, 1996. When the child was six days old, she and her mother (Angela Jacobs) came to Tennessee with the child's father (Shawn Bruce) to live. D.R.B.'s parents were, and remain, unmarried, although at the time of the hearing, the mother was pregnant with a second child fathered by D.R.B.'s father. Shortly after the award of temporary custody to the paternal grandparents, the mother returned to Michigan, where she was still living at the time of the hearing.

Shortly after D.R.B.'s birth, her mother agreed to move with the infant to Tennessee. The mother didn't want to fly, so D.R.B.'s father, the father's ten-year-old sister, and his mother (Cheryl Bruce) drove to Michigan from Tennessee and transported D.R.B. and her 22-year-old mother to Tennessee. Upon arriving in Tennessee, D.R.B.'s mother and father established a residence and kept D.R.B. for a couple of days. What began as assistance and babysitting by the paternal grandparents (the Bruces) expanded to virtually full time care, due to the inability and/or unwillingness of D.R.B.'s parents to care for her.

The paternal grandparents (the Bruces) became concerned for D.R.B.'s

welfare because of the parents' behavior. After their 10-year-old daughter (D.R.B.'s aunt) saw Ms. Jacobs shake the infant, scream at her, and throw her on a bed because she was crying, the Bruces took action.

The Bruces filed an Intervening Petition for Child Custody on January 22, 1997. The original Intervening Petition named as Respondents both the infant's mother, Angela Jacobs, and the infant's father, Shawn Bruce, the Bruces' son. Two weeks before the final hearing in this matter, the Bruces moved to amend their petition to add the natural father, Shawn Bruce, as a Petitioner and remove him as a Respondent. The motion further asked that "Petitioners be granted joint custody of the minor child."[1] The record indicates that the court never ruled on this motion. However, the father, Shawn Bruce, stated at the hearing, "My wishes are that D.R.B. stays where she's at where I know she'll be safe...". When directly asked if he was seeking custody, the father answered, "When I'm able to I will. When I'm able to live on my own means and I know that my daughter is secure. For now I know that my daughter is in the safest hands." For some time before the hearing, the father had been living in his parents' house and helping to care for D.R.B.

In conjunction with temporary custody, the petition sought a restraining order prohibiting D.R.B.'s mother from removing D.R.B. from Tennessee. The trial court issued the restraining order on January 22, and granted the petition for temporary custody the following day, pending a hearing.

After hearings on January 27 and April 2, 1997, the trial court ordered the Tennessee Department of Children's Services and its Michigan equivalent to conduct home studies of the Bruces and Ms. Jacobs who had returned to

---

[1]This motion was not made by or on behalf of the father, Shawn Bruce. Additionally, the father is not a party to this appeal.

3

Michigan to live with her mother. During the studies, custody remained with the paternal grandparents with visitation granted to D.R.B.'s mother. A three-day hearing was held in November 1997.

After the hearing concluded, the trial court determined that custody should remain with the paternal grandparents, the Bruces, with reasonable visitation to D.R.B.'s mother, Ms. Jacobs. The court also ordered D.R.B.'s mother to pay child support and prohibited her from removing the child from the court's jurisdiction.

I.

D.R.B.'s mother argues that the trial court abused its discretion by awarding custody to the paternal grandparents because her right to the child is superior to that of third parties like the paternal grandparents.

Our courts have long recognized that "the right of a parent is superior in a custody dispute between a parent and a third party." *Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. App. 1992). In a contest between a natural parent and a non-parent, the parent cannot be deprived of the custody of the child absent a finding, after proper notice in accordance with due process, that substantial harm threatens the child's welfare if custody is left with or given to the parent. *See Adoption of Female Child,* 896 S.W.2d 546, 548 (Tenn. 1995). Only after making such a finding may a court engage in a general "best interest of the child" evaluation to determine custody. In the recent case of *In re Bianca Arneshe Askew*, 993 S.W.2d 1 (Tenn. May 3, 1999), our Supreme Court reaffirmed the requirement that a court must find that custody to the natural parent would result in substantial harm to the child.[2]

---

[2]The Court indicated that sufficient grounds for a non-parent to seek custody might also include unfitness of the parent and dependency and neglect of the child.

Ordinarily our review of a trial court's determinations would be *de novo* with a presumption that the trial court's findings of fact are correct. See Tenn. R. App. P. 13(d). However, the trial court's failure to make findings of fact, written or otherwise, leaves nothing to which the presumption of correctness can attach. In such a situation, our review is *de novo* without a presumption of correctness. *See Goodman v. Memphis Park Comm'n*, 851 S.W.2d 165, 166 (Tenn. App. 1992); *see Kelly v. Kelly*, 679 S.W.2d 458, 460 (Tenn. App.1984).

Herein, the trial court made no explicit finding regarding the threat of harm to the child if custody were awarded to the mother.[3] In *In re Bianca Askew*, the Supreme Court found that the lack of such a finding in that case was fatal to the award of custody to a non-parent. *In re Bianca Arneshe Askew*, 993 S.W.2d at 12. However, in that case, "an explicit and implicit reading of the order . . . [conveyed] every indication that the juvenile court intended to return [the child] to the custody of her natural parents in the near future." *Id.*, 993 S.W.2d at 14. Additionally, nothing in the record of that case even alluded to potential harm to the child if she were returned to her mother. In contrast, the well-developed record before this court and the trial court's order herein (which includes no statement which could be interpreted to indicate an intention to return custody to the mother) permit us to review the record and make the requisite findings.

## II.

At the November hearing, D.R.B.'s mother acknowledged that the original grant of temporary custody to the paternal grandparents had been due to her own actions and those of D.R.B.'s father. When asked if she understood that she was responsible for the Bruces having temporary custody, Ms. Jacobs replied, "from

---

[3]The trial court's comments at the beginning of the hearing indicated he was well aware of the high standard which non-parents must meet when seeking custody from a child's parent.

my understanding, it was from mine and Shawn's actions."

Until she was approximately seven months pregnant with D.R.B., Ms. Jacobs was living in a motel in a "prostitution zone." She moved into her mother's house prior to D.R.B.'s birth. She agreed to move to Tennessee with the baby because she wanted a family and wanted to work things out with D.R.B.'s father. She acknowledged that she was ill-prepared for motherhood. She also acknowledged that she and the baby's father left the infant with the Bruces most of the time.

The paternal grandmother, Ms. Bruce, also described those early days when D.R.B. first was brought to Tennessee. Ms. Bruce encouraged her son and Mr. Jacobs to participate in the child's care, but stated that they were more interested in remaining "constantly high" on marijuana and prescription drugs. Ms. Jacobs and D.R.B. arrived in Tennessee on December 31, 1996. Ms. Jacobs kept D.R.B. in her care for two days, but continually called the paternal grandparents and asked them to come get the baby. During the next two weeks, the Bruces would try to get D.R.B.'s parents to come to their house and to take the baby back with them. The parents always declined, using various excuses, most of which related to their impaired ability to care for the baby due to alcohol and drug use, including prescription drugs. Ms. Bruce testified that when visiting the parents, she had observed the baby's mother in a "trance", unresponsive to things around her. After about two weeks, the parents no longer even made excuses or bothered to ask the Bruces to keep the child. The infant remained in the Bruces' care at their home, a situation acknowledged to be at the request of the parents.

During this time, Ms. Jacobs confided to Ms. Bruce about various problems she was having. Ms. Jacobs felt her baby hated her and was concerned

she (the mother) would hurt the baby. She feared post-partum depression and was experiencing dramatic mood swings. She talked to medical personnel, at a visit arranged and observed by Ms. Bruce, about these issues and about the trances she would occasionally experience. Ms. Jacobs later testified that she has since been diagnosed as manic depressive and also suffers from depression which she attributes to an incident in her earlier life.

The paternal grandmother, Ms. Bruce, was concerned about the baby's welfare due to the parents' inability to care for her, the mother's concerns about her relationship with the baby, her own observations of the parents' impaired states, and the mother's yelling at the baby when it cried. The shaking incident happened while the paternal grandmother had taken the father to the vet with the parents' sick dog. Ms. Bruce took her ten-year old daughter out of school to stay with Ms. Jacobs and the baby because she was afraid to leave the mother alone with the baby. D.R.B.'s ten-year old aunt described in some detail how she observed Ms. Jacobs scream at the baby for crying, violently shake the baby, and throw her on the bed. The aunt was so upset that she ran downstairs and tried to telephone her parents for help. When Ms. Bruce arrived back at the apartment, her ten-year old daughter told her what had happened. The Bruces immediately instituted proceedings for temporary custody. D.R.B.'s mother denies that she shook the baby.

Shortly after the award of temporary custody to the Bruces, D.R.B.'s mother returned to Michigan to live with her mother. D.R.B.'s father was in jail at that time. [4] From the time Ms. Jacobs returned to Michigan in early February of 1997 until just prior to the hearing in November of 1997, she returned to

---

[4] The record is not clear whether the incarceration was the result of the father's assault on his own father, or due to unrelated charges from another county, or both.

Tennessee only twice. The first time was around Easter. Although she was invited, even encouraged, according to the testimony of Ms. Bruce, to spend time with her child, she spent only a few hours over a 6 to 7 day visit, although she spent a great deal of time with Shawn Bruce. About a month later, Ms. Jacobs returned to Tennessee with the intention of establishing residence and working things out with D.R.B.'s father. Ms. Jacobs apparently told several people that her mother had told her to find a new residence after the two had an argument. Although Ms. Jacobs denied that her needing to leave her mother's house was the primary reason for her decision to come to Tennessee, she admitted that she had had an argument with her mother. She also stated that when she and her mother disagreed, "I just go my own way and she goes hers."

Ms. Jacobs stated that she came to Tennessee to visit her baby. Instead of visiting with D.R.B. when she arrived, as the Bruces invited her to do, she later sought a court order for visitation, which provided for one hour per week. According to the social worker who was to supervise the visits, Ms. Jacobs chose not to come to the first visit because it was raining. She did make one visit with the infant at the social worker's office during her three to four week stay.

A few days prior to the November hearing, Ms. Jacobs exercised visitation with her child at the DHS office. Ms. Bruce testified that she had encouraged Ms. Jacobs to spend more time with D.R.B. on her visits to Tennessee. Ms. Jacobs testified that there had never been any problems with the Bruces about her visitation with D.R.B., that the Bruces had not tried to keep the child from her on her visits to Tennessee, but that she had just felt uncomfortable.

D.R.B.'s father testified that he wanted his parents to continue caring for the child until he and D.R.B.'s mother could straighten out their lives. He admitted that he had previously been jailed for assaulting his father, had theft

8

charges pending, and had abused alcohol and drugs. However, he offered proof he was now employed, living with his parents and had attended Alcoholics and Narcotics Anonymous meetings. He also testified that D.R.B.'s mother had abused drugs before, during, and after she was pregnant with D.R.B., and was presently carrying his second child.

Although Ms. Jacobs denied using marijuana after March of 1996, others testified to seeing her use that drug as late as June of 1997, as well as during the time she originally moved to Tennessee with the six-day-old D.R.B. While seven or eight months pregnant, Ms. Jacobs sent a letter from Michigan to Shawn Bruce which stated that while she and others were downstairs smoking at her mother's house, her mother's live-in companion "was asking us who had the joint and wanted to hit it." Ms. Jacobs also testified that she had been attending an alcohol and drug abuse program, but denied that she participates in that program because of a drug or alcohol problem. She also attended counseling for depression related to a traumatic incident in her earlier life.

A report from the Michigan Family Independence Agency admitted at the hearing indicated that D.R.B.'s maternal grandmother lived with her third husband in a well-maintained house in a lower middle class neighborhood. Notwithstanding that information, Ms. Jacobs's mother and the man she resided with were not married. At the time of the report, this man was employed and the maternal grandmother was on short-term disability. The report indicated that Ms. Jacobs was seeking part-time employment, planned to obtain her GED, and was eligible for Medicaid coverage for her unborn child. At the hearing, Ms. Jacobs testified she had been employed as a telephone marketer for almost one month.

The report stated that Ms. Jacobs dropped out of school in the tenth grade

9

and became an emancipated minor at sixteen. After a traumatic incident, she began experimenting with marijuana and alcohol. She became an exotic dancer in her teens. She was employed as a dancer in a strip club at the time she met Shawn Bruce and testified that she had worked as a dancer at that same club during the year prior to the November 1997 hearing.

The report stated that Ms. Jacobs intended to remain at her mother's home, had completed a series of parenting classes and group therapy and attended Narcotics Anonymous meetings. The report found the maternal grandmother's home "suitable for placement" of D.R.B., but its author testified in deposition that if Ms. Jacobs were to try to care for the child on her own, outside her mother's home, the author "would have some concerns." The author also indicated that any return of the child to the mother's custody should be conditioned on (1) Ms. Jacobs remaining in her mother's home and (2) weekly counseling and in-home supervision or monitoring.

Notwithstanding the fact that the Michigan home study was premised on Ms. Jacobs's continued residence in her mother's home, the record shows that even during the course of these proceedings she was unable to remain there or cohabit peacefully with her mother for extended periods of time. The record establishes that the maternal grandmother had a troubled relationship with Ms. Jacobs, who had been without adult supervision from the time of her emancipation at age 16. The maternal grandmother testified that more than once in the past two years she and Ms. Jacobs had fought, resulting in Ms. Jacobs leaving her mother's home. Ms. Jacobs admitted that she had told Shawn Bruce that her brief move to Tennessee in May followed an argument with her mother, although she denies that was the reason for the move.

Before returning to Michigan, D.R.B.'s mother wrote the custodial

grandparents a profane letter expressing an intent to take the child to Michigan and prevent them from seeing her, notwithstanding the order prohibiting the child's removal from this State.

The record showed that the custodial grandparents provided D.R.B. with full-time care and a stable environment, and attended church regularly. The custodial grandparents resided in a three bedroom, two bath home with their ten-year-old daughter. D.R.B.'s father lived in the basement, which also had a bathroom. He participated in D.R.B.'s care and paid some child support and rent to his parents. The paternal grandmother reported that D.R.B. had a congenital heart defect which required regular monitoring by physicians at Vanderbilt in Nashville, and that she and her husband also took D.R.B. for weekly medical examinations locally.

The record does not reflect a consistent effort by D.R.B.'s mother to develop and maintain a healthy relationship with or environment for D.R.B. The case worker who had dealt with the parties and prepared the home study report on the Bruces expressed concern over Ms. Jacobs's failure to establish a relationship with her child. She was concerned because, as a consequence of Ms. Jacobs's failure to visit her child, no bonding had occurred between the two. She also stated that Ms. Jacobs was irresponsible, while she found that the Bruces had been responsible custodians of D.R.B.

Based upon the facts in the record of this case, we find that an award of custody to the mother poses a threat of substantial harm to the welfare of the child. We additionally find that continued custody with the custodial grandparents is in D.R.B.'s best interest. *See Hawk v. Hawk*, 855 S.W.2d 573, 580-581; *see Olen v. Altherr,* No. 03A01-9805-CV-00166, 1998 WL 820733, * 1 (Tenn. App. November 24, 1998). While it is admirable that D.R.B.'s mother

11

has sought counseling and attended drug and alcohol treatment programs, we believe the record clearly demonstrates that she is not yet able to provide a stable environment or proper care for D.R.B. and that she has failed to establish or maintain a relationship with her child, only sporadically taking the opportunities presented to her to visit D.R.B. At the time of the hearing, D.R.B.'s mother was unmarried, pregnant, undereducated, manic-depressive, had abused drugs, and had been seen abusing D.R.B. Nothing in the record indicated that she would no longer present a threat to D.R.B.'s physical welfare. This evidence preponderates against a reversal of the trial court's award of custody to the paternal grandparents, the Bruces.

III.

Ms. Jacobs contends that the Bruces' failure to attach to their petition an affidavit regarding D.R.B.'s "home state" as contemplated by Tenn. Code Ann. § 36-6-210 required dismissal of the petition. She also argues that the trial court abused its discretion in finding that Tennessee was D.R.B.'s home state.

Tenn. Code Ann. § 36-6-210 states in pertinent part:

**Information in a first pleading or affidavit -- Continuing duty to inform court. -- (a)** Every party in a custody proceeding in its first pleading or in an affidavit attached to that pleading shall give information under oath as to the child's present address, the places where the child has lived within the last five (5) years, and the names and present addresses of the persons with whom the child has lived during that period . . . .

Although the paternal grandparents' petition does not include the requisite information, the statute's requirements are not jurisdictional. *See Powell v. Powell*, No. 02A01-9501-CH-0006, 1996 W.L. 469 (Tenn. App. August 15, 1996). Because the procedural issues regarding the affidavit D.R.B.'s mother raises on appeal are not jurisdictional, her failure to present them to the trial court precludes her from raising them for the first time on appeal. *See id.*; *see*

12

*Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

Furthermore, we find the trial court's exercise of jurisdiction was authorized under Tenn. Code Ann. § 36-6-203(a)(2). At the time of the initial temporary custody determination, no other state had exercised jurisdiction. Additionally, D.R.B. had significant connections with Tennessee. When the petition was filed D.R.B. and her parents were living in Tennessee, and D.R.B. (who was approximately one month old then) had resided in Tennessee for all but six days of her life. The shaking incident occurred here, and the witness to the incident resided here. Substantial evidence concerning D.R.B.'s present and future care, protection, training and personal relationships existed here. In light of the possible threat to D.R.B.'s physical welfare, we find her best interests required the immediate exercise of jurisdiction. *See also* Tenn. Code Ann. § 36-6-204(a)(2).

IV.

In light of the evidence, we must reject D.R.B.'s mother's contention that the trial court abused its discretion in refusing to apply the tender years doctrine. Having determined that she is presently unfit to resume custody of D.R.B., we find the tender years doctrine is not controlling under the facts of this case. *See Ruyle v. Ruyle,* 928 S.W.2d 439, 441-442 (Tenn. App. 1996); *see Malone v. Malone*, 842 S.W.2d 621, 623 (Tenn. App. 1992).

D.R.B.'s mother's also contends that she should have been awarded custody in order to keep D.R.B. and her then unborn sibling together. We disagree. The principle that siblings should not be separated by a custody order necessarily gives way to the paramount consideration of the child's best interest. *See Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. 1983); *Rice v. Rice*, No. 03A01-9709-CV-00415, 1998 WL 135571, * 4 (Tenn. App., March 26, 1998).

13

Clearly, D.R.B.'s best interest at this time lies in remaining with her paternal grandparents. Moreover, notwithstanding Appellee's argument, the fact that D.R.B. has never met her sibling, who was not yet born at the time of the hearing, logically precludes a loss of stability resulting from their separation.

IV.

Ms. Jacobs maintains that the trial court abused its discretion in issuing the restraining order which prohibited her from removing D.R.B. from the State. She argues that the absence of a bond, affidavit, or verification invalidated the order. Ms. Jacobs' failure to contest this issue in the trial court precludes her from raising it for the first time on appeal. *Civil Service Merit Board v. Burson*, 816 S.W.2d 725, 734-735 (Tenn. 1991). Moreover, the record shows that the Bruces' petition was verified and the paternal grandfather was surety on a $500 bond to cover costs. Tenn. R. Civ. P. 65.05 (1); *see also* Tenn. R. Civ. P. 65.07 (authorizing the issuance of restraining orders in domestic relations cases on such terms and conditions "as shall seem just and proper to the judge . . ."). The restraining order which D.R.B.'s mother challenges, issued after the three-day hearing, prohibits her from removing D.R.B. from the court's jurisdiction. Based upon D.R.B.'s mother's threats to do just that, we find that order just and proper.

V.

The paternal grandparents argue that they are entitled to attorney's fees and costs on the ground that this appeal is frivolous. Having reviewed the entire record and all issues raised by the parties, we decline to grant this request.

Accordingly, having considered the entire record, we affirm the trial court's entrustment of custody to the paternal grandparents. Their request for

attorney's fees is denied. This case is remanded for such further proceedings as may be required. The costs of this appeal should be taxed to Ms. Jacobs.

_____

PATRICIA J. COTTRELL, JUDGE

CONCUR:


_____

WILLIAM C. KOCH, JR., JUDGE


_____

WILLIAM B. CAIN, JUDGE

15